**Frank J. VALENTE, III, and Annette M. Valente, d/b/a Tri-City Cleaners, d/b/a Valet Maintenance, Appellants,**

v.

**The SAVINGS BANK OF ROCKVILLE, Appellee.**

Civ. No. H–83–177.

United States District Court,
D. Connecticut.

Oct. 12, 1983.

Richard Leibert, Hartford, Conn., for appellants.

Charles A. Maglieri, Pigeon & Gnutti, Stafford Springs, Conn., for appellee.

## RULING ON APPEAL FROM BANKRUPTCY COURT

CLARIE, Senior District Judge.

The appellant debtors, Frank J. Valente, III and Annette M. Valente, doing business as Tri-City Cleaners and also as Valet Maintenance, ("debtors" or "the Valentes") appeal from an order of the United States Bankruptcy Court, District of Connecticut (Krechevsky, B.J.) sustaining the objection of appellee The Savings Bank of Rockville ("the bank") to the confirmation of debtors' Chapter 11 plan. The Bankruptcy Court held that after a mortgage debt has been "merged" into a final state court judgment of foreclosure, the Bankruptcy Code does not allow a debtor to cure a default and reinstate the mortgage. The Bankruptcy Court further held that the bank's claim was "impaired" under § 1124(2) of Chapter 11. This Court finds that (1) a Connecticut judgment of foreclosure by sale is not sufficiently final to invoke the "merger doctrine" until judicial confirmation thereof, (2) even if the merger doctrine were properly invoked, the curing provisions of § 1123(a)(5)(G) of Chapter 11 provide a debtor, who has any legal or equitable interest remaining in real property, the opportunity to present its proposed plan to cure, and (3) if the Bankruptcy Court finds from the totality of the equities that said plan cures a defaulted claim, said claim is "not impaired" under § 1124(2). The Court reverses the decision of the Bankruptcy Court and remands the debtors' plan to said Court for consideration on the merits, in a manner not inconsistent with this Court's findings.

### Facts

On October 12, 1973, the Valentes secured a debt owed the bank, by granting it a first mortgage on their home together with the dry cleaning establishment ("property"), located at 95 Anderson Road in Tolland, Connecticut. The principal amount of the mortgage was $30,000. In June, 1980, the Valentes defaulted on their monthly payments. The bank accelerated the mortgage debt and on October 28, 1980, commenced a foreclosure action in the Connecticut Superior Court. On March 31, 1981, the state court entered a judgment of strict foreclosure totalling $31,377.49 against the debtors and set September 1, 1981 as the "law day." On April 27, 1981, on the debtors' motion, the state court reopened the judgment of strict foreclosure, ordered a foreclosure by

sale and established September 19, 1981 as the sale date. On August 12, 1981, the debtors filed a Chapter 13 petition. This action automatically stayed the execution of the judicial sale. The debtors' Chapter 13 plan sought to cure the default by paying arrearages and to de-accelerate the mortgage. The bank objected to confirmation of the plan. On November 30, 1981, the Bankruptcy Court sustained the bank's objection and denied confirmation of the plan. Subsequently, the debtors voluntarily dismissed their Chapter 13 petition.

On January 28, 1982, the Valentes filed the Chapter 11 petition that is currently on appeal to this Court. Article 2.2 of their amended plan of reorganization classifies the bank's claim as "not impaired" and seeks to cure the default by paying both "existing arrearages and additional compensation for damages incurred by said creditor as a result of its reasonable reliance on its contractual rights or applicable state law over a twelve-month period in monthly installments and also "its regular monthly mortgage payment." The bank objected to both the characterization of its claim as "not impaired" and to the confirmation of the plan. On December 16, 1982, the Bankruptcy Court sustained the bank's objections, holding that a "debtor cannot use the Bankruptcy Code to undo a final and valid state court judgment [of foreclosure] in the format of curing a default."

*Discussion of Law*

A. *A Connecticut Judgment of Foreclosure by Sale is Not Sufficiently Final to Warrant the Merger of a Mortgage Debt into Said Judgment.*

■ The decision of the Bankruptcy Court takes the position that state law, specifically the "merger doctrine," governs cure and de-acceleration cases in this district. This doctrine would establish that, "once a foreclosure action has gone to judgment, the mortgage is merged into the judgment, leaving the mortgagor with only the right to redeem by payment of the entire debt." *In the Matter of Frank J. Valente, III,* 34 B.R. 804, (Bkrtcy.D. Conn.1982). It further declares that once a mortgage has "merged into a final judgment of foreclosure, [it] is no longer susceptible to cure of default and de-acceleration" through bankruptcy proceedings. *Id.* The rationale behind the merger doctrine is that final state court judgments should not be disturbed by bankruptcy proceeding without explicit Congressional authorization and that such authorization does not exist in either Chapter 11 or Chapter 13. *Id.,* at 7–8. This Court finds that such Congressional authorization does exist, at least in Chapter 11, (*See* §§ B and C, *Discussion of Law, supra*) and also finds that a Connecticut state judgment foreclosure by sale is not final until the sale is ratified by the court.

The Bankruptcy Court's reliance upon the merger doctrine is premised on two cases (in addition to its own earlier, Chapter 13 holding in this case): *In re Maiorino,* 15 B.R. 254 (Bkrtcy.D.Conn.1981), *appeal dismissed because judgment not final, sub nom Maiorino v. Branford Savings Bank,* 691 F.2d 89 (2d Cir.1982), and *In re Canady,* 9 B.R. 428, 7 B.C.D. 749 (Bkrtcy.D.Conn.1981). As the court in *Maiorino* quoted *Canady's* language *verbatim* on this point, (*See Maiorino, supra,* 15 B.R. at 256–57) the burden for establishing the merger theory as precedential doctrine in such cure and de-acceleration cases for the District of Connecticut ultimately rests upon *Canady.*

In *Canady,* Bankruptcy Judge Schwartzberg, of the Southern District of New York, sitting by designation in Connecticut, asserted without citing either Connecticut case law or statutes, that in Connecticut, on the day the judgment of foreclosure is entered, a mortgage merges into the judgment, and is thereby "laid to final rest." *Canady, supra,* at 429–30.

It is clear that a Connecticut judgment of foreclosure by sale is not sufficiently final so as to merge a mortgage irrevocably into itself.[1] The Court must necessarily analyze

---

1. In addition, neither is a Connecticut strict

foreclosure likely final enough to merge a mort-

the nature of a Connecticut judgment of foreclosure by sale, to examine its essential legal characteristics.

The United States Supreme Court has authorized such an examination by the Bankruptcy Court to scrutinize "merged" claims, so as "to determine the essential nature of the liability for purposes of proof and allowance," *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939), and to implement broad federal policies of bankruptcy law. *Chicago Board of Trade v. Johnson,* 264 U.S. 1, 10, 44 S.Ct. 232, 234, 68 L.Ed. 533 (1924). The ability to analyze state court judgments is particularly vital in cases involving cure and de-acceleration of residential and business mortgages. Mechanical recitation of the merger theory should not become a talismanic formula, before which the rights of debtors to preserve their homes and livelihoods shrivel and disappear.

Examining the so-called "final" judgments of foreclosure by sale in Connecticut, the Court finds them anything *but* final. As the Bankruptcy Court of this district has stated, "Connecticut decisional law indicates that a judicial sale under [the Connecticut foreclosure by sale statute] becomes complete and creates legal rights and obligations among the parties when it is confirmed and ratified by the court." *Matter of Loubier,* 6 B.R. 298, 302 (Bkrtcy.D. Conn.1980). Furthermore, the fact that sanctions are imposed after court ratification, underscores the "finality with which confirmation of a foreclosure sale allocates

legal rights and obligations under Connecticut law." *Id.* One commentator, remarking upon this fact, called the Connecticut judgment of foreclosure by sale "interlocutory in nature." Caron, *Connecticut Foreclosures,* at 68, 108 (1981).

■ Certainly, a mortgage cannot be "laid to final rest" by "merging" into a judgment which is not final. Indeed, no merger could possibly take place *until* the judicial sale does become final, i.e., upon court ratification thereof. Thus, even if this Court were to follow state law and the merger doctrine, a debtor subjected to a Connecticut judgment of foreclosure by sale, could invoke the Bankruptcy Code's curative provisions until the sale was ratified without upsetting a final state court judgment.[2]

B. *Where the Federal Bankruptcy Code Allows Cure, the Code Affords a Debtor the Opportunity to Attempt Cure of a Default After a State Court Foreclosure Judgment As Long As the Debtor Retains a Viable Interest in the Property Foreclosed Upon.*

■ The Court does not rest its decision completely upon state law. The Constitution of the United States has empowered Congress to establish "uniform laws on the Subject of Bankruptcies throughout the United States." U.S. Const., Art. I, § 8, cl. 4. To the extent that Congress has acted in pursuance of this grant of authority, its laws are supreme to those of the states.

---

gage irrevocably into itself. Merger theorists maintain that, upon foreclosure, in a title theory mortgage state (such as Connecticut), the mortgage merges into the judgment so that no debt remains to be cured. J. Sables, *A Chapter 13 Debtor's Right to Cure Default Under § 1322(b): A Problem of Interpretation,* 57 Amer.Bankr.L.J. 127, 131–32 (1983). However, if a judgment does not have practical finality (i.e., when title in the mortgagee is clouded by mortgagor's equity of redemption until the law day) so that the legal rights do not vest until some future date, the merger cannot have its operative effect until that future time. (*See In re Hewitt,* 16 B.R. 973, 978–79 (Bkrtcy.D.Alas. 1983)). In Connecticut, a judgment of strict foreclosure may be opened and modified and the law date extended, at any time prior to the

time title becomes absolute in an encumbrancer under Conn.Gen.Stat. § 49–15. As such, the judgment would not be deemed to be sufficiently final to lay the mortgage to "final rest."

**2.** This view harmonizes with the view of black letter law throughout much of the United States. "Although there is some conflict on the question, generally prevailing view favors the doctrine that a decree of foreclosure does not merge the lien of the mortgage until it has been consummated by sale and satisfaction. The decree does not, it has been said, destroy the lien of the mortgage but, rather, judicially determines the amount thereof." 55 Am. Jur.2d. *Mortgages* § 623. *See also* cases cited therein.

*Id.,* at Art. VI., cl. 2. Bankruptcy provisions allowing the opportunity to cure accelerated debts are no exception to the general rule of the Supremacy Clause. As one court has aptly stated, "federal law . . . overrides state law concerning acceleration because of the supreme constitutional power of Congress to enact bankruptcy laws." *In re Hardin,* 16 B.R. 810, 813 (Bkrtcy.N.D. Tex.1982). Because the opportunity to cure a default, secured by federal bankruptcy law and designed to protect "the estates of debtors for their rehabilitation," is "paramount" to state law, no actual conflict exists with "state court jurisdiction." *First Investment Co. v. Custer,* 18 B.R. 842, 848 (Bkrtcy.D.S.D.1982). Thus, where cure is allowed by the Bankruptcy Code, any debtor who maintains a viable interest in property comprehended by the Code should have the opportunity to present a plan of cure before the equitable powers of the Bankruptcy Court.

■ The Valentes are just such debtors. Under Connecticut law, they own an equity of redemption, unless and until a sale takes place and is confirmed. *Loubier, supra,* at 303. Equities of redemption are "equitable interests of the debtor in property," 11 U.S.C. § 541, and are thus part of the estate over which the Bankruptcy Code has jurisdiction. *Id., Loubier, supra,* at 300–03, 4 *Collier on Bankruptcy* (15th ed.) ¶ 541.-07[3]. Thus, the Bankruptcy Code, specifically the curative provisions of Chapter 11, may be exercised by the debtors in this case, even after a final state court judgment, to attempt to de-accelerate their debt and reinstate their mortgage.

## C. *Equitable Powers of the Bankruptcy Court Under 11 U.S.C. § 1123(a)(5)(G).*

■ Chapter 11 authorizes cure of a default in 11 U.S.C. § 1123(a)(5)(G). *In re Taddeo,* 685 F.2d 24, 29 (2d Cir.1982). This subsection states simply, in pertinent part:

"(a) A plan shall—. . .

(5) provide adequate means for the plan's execution such as—. . .

(G) curing or waiving any default."

The Second Circuit has suggested that § 1123(a)(5)(G) authorizes de-acceleration. In *Taddeo, supra,* at 28, the court held that the "concept of 'cure' [as authorized in Chapter 13] contains the power to de-accelerate." In the same case, the court found the language authorizing cure in Chapter 11 [§ 1123(a)(5)(G)] "similar to" that of Chapter 13 and the concept of cure "the same thing" in both Chapters. *Id.,* at 29. The Court finds that the authority to cure granted by § 1123(a)(5)(G) encompasses the "power to de-accelerate."

■ The Court further finds that the power to cure authorized by § 1123(a)(5)(G) reaches even to state courts' final judgments. Nothing in the language of this sub-section restricts its "power to de-accelerate" from reaching such judgments. Rather, the express language of the subsection provides for the cure of "any default," without limitation. This conclusion is buttressed by the context in which the curing authorization arises. This provision is part and parcel of subsection (a)(5), which provides the means by which a debtor executes his proposed plan. The latter's plan, as evidenced by § 1123(a)(1–4), reorganizes and disposes of "claims." "Claims," according to 11 U.S.C. § 101(4), include any rights to payment, whether or not they have been "reduced to judgment." If the plan, and by necessary implication, its executing section, § (a)(5), were meant to dispose of judgments, as well as claims not yet reduced to judgment, so, too, must the curing provision, one of the several means listed in § (a)(5) for said disposition, reach judgments. As such, Chapter 11 debtors whose debts have been reduced to judgment in state court may avail themselves of Chapter 11's curing provisions. A bankruptcy court may not deny, as a matter of law, confirmation of a plan requesting cure of a default simply because said default has been reduced to judgment in state court. Conversely, cure is by no means to be granted as a matter of course. A bankruptcy court should not find that cure can take place simply because a debtor submits a plan of cure. Rather, the bankruptcy court should determine, on the merits, considering all the

facts and surrounding circumstances, whether a plan cures the default at issue and whether the debtors can fulfill the obligations of their plan. The chance to present such a plan is the opportunity afforded by § 1123(a)(5)(G) to Chapter 11 debtors who retain an interest in defaulted-upon property over which the bankruptcy court has jurisdiction.[3]

■ The Court holds that the Bankruptcy Court below unlawfully denied to the debtors this opportunity, and therefore reverses the Bankruptcy Court's decision. The Court remands the debtors' plan to the Bankruptcy Court below for a determination of whether, considering all the facts, the law and equitable remedies, said plan satisfies the requirements of cure, specified by the law of the land.

■ On remand, the Bankruptcy Court should consider all the facts and circumstances surrounding the debtors' proposed plan. Such an equitable deliberation would be in accord with the Bankruptcy Court's status as a court of equity. *General Motors Acceptance Corporation v. Smith,* 377 F.2d 271, 274 (4th Cir.1967), *Matter of Supreme Plastics,* 8 B.R. 730 (D.Ill.1980). Equitable considerations should include the following factors: (1) whether the debtors' crisis is indeed a "temporary" crisis, (*see* S.Rep. No. 989, 95th Cong. 2d Sess. 120 (1978), U.S. Code Cong. & Admin.News 1978, p. 5787), (2) the proximity in time of the debtors' filing for bankruptcy protection to the sale date or law day, (3) the conditions of the plan itself, (4) the debtors' financial ability

to carry out the conditions of the plan, and (5) the debtors' capacity to pay arrearages and costs at the time of filing. This list is meant neither to be exclusive nor conclusive. The list is not arranged in order of either weight or priority. In addition, no one item is meant to be dispositive of the issue of cure.

*Taddeo* supplies legal standards for the Bankruptcy Court's determination on remand. In that case, the Second Circuit held that cure occurs when "the event of default is remedied and the consequences are nullified." *Taddeo, supra,* at 29. *In accord* are *In re Tuchman,* 29 B.R. 39, 40 (Bkrtcy.D.N.Y.1983) and *In re Johnson,* 29 B.R. 104, 105 (Bkrtcy.D.Fla.1983). If the plan provides for "taking care of the triggering event and returning to pre-default conditions [,] [t]he consequences are thus nullified." *Taddeo, supra,* at 26. Under the particular facts of *Taddeo* (with only one creditor and little doubt that debtors could fulfill the conditions of their plan), the payment of arrearages in $100 monthly installments, and a restoration of the mortgage and its original payment schedule (with the trustee as payee for the life of the plan and the mortgagee as payee thereafter) satisfied the above-mentioned requirements of cure. *Id.,* at 25–6. If the Bankruptcy Court, considering all the facts and surrounding circumstances, finds that the Valentes' plan comports with the *Taddeo* requirements of cure, the judge may confirm the plan.

The determination of impairment under 11 U.S.C. § 1124(2) on remand is contingent

---

**3.** This straightforward approach commends itself to several aspects of Constitutional and judicial policy, including (1) the Supremacy Clause, which maintains that once a federal right to cure is recognized, "a state law to the contrary must fall;" *Taddeo, supra,* at 29; (2) the constitutional mandate of uniformity among bankruptcy laws; U.S. Const. Art. I, § 8, cl. 4 (*see also* Sables, *supra,* cited at n. 1, regarding the "multiplication of conflicting adjudications" that exist in the current state of the law in this area, at 137); (3) the bankruptcy court's ability to look behind state court judgments so as to implement broad federal policy, *Chicago Board of Trade, supra;* and (4) the awareness that state court judgments of foreclosure often lack practical finality, *Hewitt, su-*

*pra,* cited at n. 1, at 978 (*see also* § A, *Discussion of Law, supra*) so that denying the right to cure simply because a default has gone to judgment becomes an elevation of form over substance. *Hardin, supra,* at 813. This proposition also finds support in *In re Sapphire Investments,* 27 B.R. 56 (Bkrtcy.D.Ariz.1983), which held that, where state law transferred no legal rights at the judgment of foreclosure by sale, the Chapter 11 debtor could cure until the sheriff's sale occurred and the redemption period had run. *Id.* at 58–9. Although Arizona is a lien state and Connecticut a title state, the Court there found a lack of finality similar to that found by this Court in state judgments of foreclosure by sale.

upon the determination of cure. Once again, *Taddeo* states the law in this Circuit. *Taddeo* teaches that while Congress has "defined impairment in the broadest possible terms," it has also "carved out a small exception to impairment in § 1124(2) providing that curing a default, even though it inevitably changes a contractual acceleration clause, does not thereby 'impair' a creditor's claim." *Id.* at 28–9. Deciding whether a plan cures a defaulted-upon claim is therefore a necessary precondition to determining whether or not that claim is impaired. Thus, if the Bankruptcy Court on remand finds that the debtors' plan cures the default at issue, the bank's claim may be deemed "not impaired" under § 1124(2).

■ This Court is aware that *In re Madison Hotel,* 29 B.R. 1003, 10 B.C.D. 770 (D.C. Wis.1983) holds otherwise regarding impairment, but this Court declines to follow the holding of that case. Although *Madison Hotel* conducted a thorough investigation of the statutory language of § 1124, it did so outside of the context of § 1123(a)(5)(G). In so doing, *Madison Hotel* failed to consider the impact of the latter sub-section, the provision authorizing cure, upon § 1124(2), in the manner described in *Taddeo* and cited above.[4] Having found the authority to cure to be broad enough to reach claims reduced to state court judgments, this Court adheres to the *Taddeo* precedent and holds that, if a Bankruptcy Judge finds that a debtor's plan cures a default, that cure renders a creditor's claim "not impaired" under § 1124(2).

If the bank's claim is "not impaired" under § 1124(2), that sub-section "takes away [the bank's] right to vote" on the proposed plan. *Taddeo, supra,* at 29. This may seem to be a harsh result. However, as both *Taddeo* and the Senate Report concerning § 1124(2) point out, "the holder of a claim or interest who under the plan is restored to his original position when others receive less or get nothing at all, is fortunate in-

deed and has no cause to complain." *Id.,* citing S.Rep. No. 989, 95th Cong., 2d Sess. at 120 (1978), U.S.Code Cong. & Admin. News 1978, p. 5906.

Therefore, the Court reverses the decision of the Bankruptcy Court and remands debtors' plan to that Court for equitable consideration consistent with this decision.

SO ORDERED.

---

4. *In re Monroe Park,* 18 B.R. 790 (Bkrtcy.D.Del. 1982), a Chapter 11 case that disallowed cure in circumstances similar to ours failed, as did *Madison Hotel,* to consider § 1123 as the source of authority to cure. Moreover, *Monroe*

*Park* relied heavily on *In re Pearson,* 10 B.R. 189 (Bkrtcy.E.D.N.Y.1981), (*see Monroe Park* at 791) a Chapter 13 case whose holding has been rendered questionable by the subsequent Second Circuit decision in *Taddeo.*